IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | No. 1:07-CR-0192-01 |
| | : | |
| v. | : | **JUDGE SYLVIA H. RAMBO** |
| | : | |
| **MALVERSE GILES** | : | |

## M E M O R A N D U M

The grand jury handed down a two-count indictment against Defendant Malverse Giles on May 9, 2007. He pled not guilty on May 29, 2007. On December 10, 2007, Defendant filed the instant motion to suppress evidence. (Doc. 91.) He argues 1) that the initial traffic stop of his vehicle was without probable cause or reasonable suspicion to believe that the vehicle was involved in criminal activity or had violated the Pennsylvania traffic code, and thus all evidence obtained by virtue of the stop should be suppressed, and 2) that, although he gave consent for the police to search his home, his consent was not voluntary and knowing, thus this court should suppress all evidence found during the search. The matter has been fully briefed and the court held a suppression hearing on January 3, 2008. The motion is ripe for disposition and will be denied.

**I.     Background**

The parties are familiar with the factual background of this matter, thus the court will provide a detailed description of the facts only as pertinent to the traffic stop and Defendant's consent to search.

**A.     The Traffic Stop**

On May 2, 2007, a joint law enforcement investigation was ongoing in Harrisburg, Pennsylvania. Certain agents were tracking one individual, Norman Thomas, who was suspected of being a "master chef" capable of stretching a quantity of cocaine into a larger quantity of crack cocaine. They noted multiple

phone calls between Thomas and Defendant on May 2. Defendant was also under investigation for drug-related activity.

At or around 4:20 p.m., Officer Mark Hall received a phone call from an agent of the Dauphin County Drug Task Force informing him that a cream-colored Dodge Magnum with a particular license plate number and registered to Malverse Giles was to be stopped, if probable cause to conduct a traffic stop was present. A car matching the description drove past. Hall re-checked the license plate number. He observed that the window tint on the vehicle was almost black such that he could not see into the car. He knew, from his training as a police officer, that such deep window tint violated the Pennsylvania Vehicle Code. Accordingly, he activated his flashing lights and effected a traffic stop of the Magnum. Although Defendant, who was driving, gave his name as "Tony Giles," Hall ultimately established that Defendant was the driver of the vehicle. Tony Giles is Defendant's brother. Hall arrested Defendant for providing false information to a law enforcement officer, an act punishable under Pennsylvania law.[1] Only later did Hall learn that Defendant had been under surveillance by other law enforcement officers earlier that day.

### B. Consent to Search

Defendant was brought to the Harrisburg Police Department at approximately 4:30 p.m. on May 2, 2008. In the course of being booked, Defendant attempted to swallow five grams of crack cocaine. Although officers believed that they managed to stop him from ingesting the drug, they took him to the hospital for

---

[1] Defendant did not specifically argue the lawfulness of his arrest in his brief in support of his motion to suppress or in oral argument at the hearing on the motion. It is clear to the court, however, that Defendant committed a crime in Hall's presence – providing false information to a police officer – which gave Hall lawful authority to arrest him. *See United States v. Watson*, 423 U.S. 411, 422-23 (1976). Because Defendant's arrest was lawful, the search of his vehicle at the scene was permissible as incident to a lawful arrest.

testing. Defendant testified that, while he was in the hospital, officers attempted to question him; the officers who testified said that they did not. By approximately 5:30 p.m., he was cleared for release. A detective testified that he observed no ill-effects from crack cocaine in Defendant's demeanor throughout the events that followed.

Defendant was released from the hospital into the custody of Detective Todd Johnson, of the Dauphin County Drug Task Force, Agent Keith Kierzkowski, of the Drug Enforcement Administration, and another law enforcement officer. They took him to the Harrisburg DEA office where they informed Defendant of his *Miranda* rights. Defendant acknowledged that he understood his rights. Here, the testimony provided by the officers differs from that provided by Defendant.

Defendant's testimony was as follows. All three agents asked him questions. After about forty-five minutes to an hour of questioning, Johnson produced a consent to search form and told Defendant that Johnson wanted to search his house. Johnson said that he was "gonna get a search warrant." (Suppr. Hr'g Tr. 65.) Johnson continued, according to Defendant:

> I know you got kids there, so you might as well let us search the house because we could go down there and kick, you know, the door. We don't want to go there and scare your kids. We don't want to do none of that. Just let us search the house and we'll make sure your kids are taken care of and stuff like that.

(*Id.* at 65-66.) Defendant told him that he would let Johnson search the house as long as Defendant could be present for the search. At that time, Defendant signed the consent to search form. If the officers had not allowed him to accompany them on the search, so that he could see his children, he would not have consented to the search.

The agents wanted Defendant to cooperate in the continuing investigation and prosecution of other drug dealers. Defendant refused. He

3

admitted, however, to confirming or denying the veracity of information that they presented. Defendant gave conflicting testimony as to whether he told the officers that he knew Norman Thomas. He answered questions about his having given a gun to another person known as "Reefer Puff." He admitted to knowing another person named Dallas Williams. He told the officers about money and a bullet-proof vest that were at his home.

The investigating officers testified as follows. After Defendant arrived at the DEA office, they questioned him for some time. At first, Defendant minimized his involvement in illicit activity, but then became more willing to answer questions and was forthcoming with information in an attempt to cooperate with them and help himself legally. Johnson testified that Defendant willingly provided information for about three to four hours. On cross-examination, Johnson testified:

> Q.   Did anybody, whether you or any of the other officers, while you were interviewing him, suggest to Mr. Giles that you were going to get a search warrant nevertheless and knock the front door of his house down? Anybody say anything like that?
> A.   No, he was cooperating.
> Q.   Did anybody suggest that maybe by knocking the door in, his children would be frightened when the police came through the front door?
> A.   No, that's kind of reverse of why we took him with us to the residence. He wanted to see his family and his children and his wife.
> Q.   Isn't it fair to say it was somewhat conditional, the consent, I mean, was conditioned upon him accompanying you to go to the house, that he would allow for the search?
> A.   No.
> Q.   So in other words – – I am going to ask that again. Was there a connection whatsoever with him granting his permission and being allowed to be present while you went and searched his house?
> A.   Absolutely not. That was a request of his that we granted after he was cooperating and giving consent.

(*Id.* at 51-52.)

The narratives by Defendant and the officers reunite here. After the officers and Defendant left the DEA office, they set off for Defendant's home. On

4

their way, they were called to bring in Defendant for arraignment first. He was arraigned at night court, during which he was advised of his right to remain silent and his right to counsel. He did not invoke either right at the arraignment or for the remainder of the time described herein.

The officers and Defendant then proceeded on to Defendant's residence where the search took place at approximately 11:30 p.m. on May 2, 2007.[2] Defendant spent the duration of the search with his wife and children, in the presence of a police officer at all times. He attempted to locate certain items missing from his home that he thought would be pertinent to the search. He gave verbal consent for the officers to search the cars on the premises.

## II. **Legal Standard – Motion to Suppress Evidence**

The Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution protect the citizens of Pennsylvania from unreasonable search and seizure. Each requires a warrant, supported by affidavits demonstrating probable cause, before the execution of a search or seizure. The warrant requirement is subject to certain exceptions, discussed as pertinent below. When a defendant challenges the legality of a search or seizure of his person or property, the government bears the burden of showing, by a preponderance of the evidence, that the search or seizure was lawfully made. *United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988).

---

[2] There is conflicting testimony about the timing of the events related above. There is some indication that the arraignment was at 11:30 p.m., and some indication that the search began at 11:30 p.m. Additionally, at some point before reaching Defendant's residence, the officers stopped to execute a search warrant at another location, leaving Defendant in the back seat of a police car.

**III.      Discussion**

      **A.     The Traffic Stop**

Defendant's argument – that the traffic stop of his vehicle was mere pretext to justify an illegal search and seizure of Defendant's person and vehicle – is mooted by Supreme Court and Third Circuit precedent. In *Whren v. United States*, the Supreme Court held that its own prior statements of the law "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." 517 U.S. 806, 813 (1996). When an officer has probable cause to believe that a defendant has violated the traffic code, a traffic stop is reasonable. *Id.* at 819; *c.f. United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) ("the *Terry* reasonable suspicion standard applies to routine traffic stops"); *Pennsylvania v. Smith*, 917 A.2d 848, 850 (Pa. Super. Ct. 2007) (75 Pa. Cons. Stat. § 6308(b) requires an officer to have reasonable suspicion to effect a traffic stop). "[A]n officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." *Delfin-Colina*, 464 F.3d at 398.

On the facts adduced at the suppression hearing, it is clear that Hall had probable cause to believe that the Dodge Magnum was being operated in violation of the vehicle code. He was aware of the gradations of window tint that are legal as distinguished from those that are illegal. The court finds his testimony credible that he knows, upon sight, that it is a violation of the law to have window tint so dark that someone is unable to see into the vehicle. Because Hall had probable cause to believe that the window tint on the Magnum was in violation of Pennsylvania traffic laws, the stop effected was lawful. This aspect of Defendant's motion will be denied.

### B.     Consent to Search

"[A] search authorized by consent is wholly valid," according to the Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). *Accord United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006). The government bears the burden of proving that the consent was "freely and voluntarily given." *Schneckloth*, 412 U.S. at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)); *see also Pennsylvania v. Mack*, 796 A.2d 967, 970 (Pa. 2002) ("The test for the validity of a consent to search is the same for both the Fourth Amendment [to the United States Constitution] and Article I, Section 8 [of the Pennsylvania Constitution] . . . ."). The free and voluntary nature of a consent must be evaluated according to all of its surrounding circumstances. *Schneckloth*, 412 U.S. at 228. Among other circumstances, "critical factors . . . include the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting party." *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005) (alteration omitted) (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)). Evidence that police coercion induced a consent renders the consent invalid. *Schneckloth*, 412 U.S. at 229. "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Id.* at 233.

Defendant contends that the following circumstances rendered his consent to search his home invalid: 1) he was questioned while in the hospital; 2) he was not advised of his right to counsel before he consented to the search; 3) the length of time he was in custody; and 4) the promise that officers would get a search warrant and scare his children while executing the warrant. The court finds, however, that the government has satisfied its burden of demonstrating, by a

preponderance of the evidence, that Defendant's consent to search his residence was freely and voluntarily given and not the result of duress or coercion.

As an initial matter, there is no evidence of record suggesting that Defendant's age, intelligence, or educational background rendered his consent involuntary. Defendant did not show signs of ill-effects from his attempt to swallow the crack cocaine. Further, the court finds credible Kierzkowski's testimony that Defendant was not questioned while in the hospital. Kierzkowski testified that he introduced himself and explained why he was there, but did not question Defendant.

Defendant was advised of his *Miranda* rights at the start of the interview at the DEA office. He was asked to consent to the search no more than an hour later. That he was not provided a similar warning immediately before being asked to consent to the search, while "relevant in considering the totality of the circumstances, . . . is hardly dispositive" because law enforcement officers are not required to provide a *Miranda*-type warning before requesting such consent. *United States v. Kikumura*, 918 F.2d 1084, 1093 (3d Cir. 1990); *see also Schneckloth*, 412 U.S. at 226-27. The consent to search form signed by Defendant states, "I understand that at any time my permission for this search may be withdrawn." (Gov't Ex. 2.) While not dispositive, the form suggests that Defendant was on notice that he was not required to give consent.

Defendant was in police custody for a lengthy period of time over the course of the day on May 2, 2007, but he granted consent to the search after being questioned for about an hour.[3] There is no suggestion that the questioning officers were unduly aggressive with their questioning, or punishing in their behavior. Under the present circumstances, this length of time for questioning does not in

---

[3] Defendant's attempt to swallow crack cocaine led to his hospitalization which delayed the beginning of his interrogation.

itself suggest that his consent was not freely and voluntarily given. *C.f. United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) (coercion is not inherent in the fact of arrest nor the fact that a suspect is handcuffed).

Similarly, that the interview continued post-consent is not indicative that the consent was coerced. Again, there is no suggestion that their behavior was unduly aggressive or punishing. The court finds credible the testimony of the interrogating officers that Defendant began the interview by minimizing his own participation in any illicit activity, but began cooperating and providing more information as the interview progressed.[4] They spent the time necessary to get the information he offered, about three or four hours. Then, after a slight detour, Defendant was arraigned. Because the officers had agreed to Defendant's request to be present at the search, he remained in their company as they made one stop, then continued on to his residence. After the search, Defendant was remanded to jail. In short, the amount of time Defendant spent in custody does not suggest that his consent was anything but freely and voluntarily given.

The court now turns to the statements allegedly made by Detective Johnson. First, his statement that he would get a search warrant must be distinguished from the statements made by agents in *Bumper v. North Carolina*, 391 U.S. at 550. In *Bumper*, law enforcement officers claimed authority to search a home because they were in possession of a warrant, in effect announcing "that the occupant ha[d] no right to resist the search." 391 U.S. at 550. The Supreme Court

---

[4] This testimony is supported by Defendant's apparent willingness to make the search easier and more effective. After his arraignment and en route to his home, Defendant remembered an bullet-proof vest in his possession there and told the officers about it. While they were searching his home, he made phone calls to persons who may have taken certain items of interest in an attempt to retrieve those items. Defendant's post-consent behavior is not determinative of what occurred before or during his decision to consent to the search, but it weighs in favor of affirming the credibility of the officers' testimony.

9

held that consent given after such a statement was invalid because it was coerced. *Id.* Here, however, assuming Johnson made the statements that he did, he did not claim that he already had a warrant; he said that he *would* get one. The police are entitled to seek a search warrant if they have probable cause. Giving a suspect the choice of consenting first is not, in itself, coercive behavior akin to that in *Bumper*. *See United States v. Ivy*, 165 F.3d 397, 403 (8th Cir. 1998); *Mack*, 796 A.2d at 970-71.

The remainder of the alleged statements by Johnson present a closer question, but one the court need not decide. Defendant and Johnson presented completely different testimony about the lead-up to Defendant's consent to search, thus the court must make a credibility determination regarding who to believe. The court certainly accepts the proposition that a threat made by the police involving one's children can be coercive, *see United States v. Santos*, 340 F. Supp. 2d 527, 538-39 (D.N.J. 2004), but declines to accept that Johnson made such threats.[5] The court finds credible Johnson's testimony that Defendant chose to cooperate with the officers and consented to the search when asked. The court also finds credible Johnson's unequivocal statement when asked whether threats to frighten Defendant's children were made in the course of requesting consent: "Absolutely not."

After Defendant gave consent, he asked to be able to accompany the officers to see his family before being taken to jail. No testimony was proffered to suggest that this is standard police practice, but the court must conclude that

---

[5] Although it is the government's burden to prove that Defendant's consent was voluntarily given, the court cannot help but observe that Defendant never testified, on direct or cross examination, that he felt threatened or coerced. On cross examination, Defendant discussed the circumstances surrounding his consent and never mentioned the alleged threat to kick down the door and frighten his children.

allowing an arrested suspect such a favor is not typical. A search conducted without a suspect, even a handcuffed one, is objectively safer for investigating officers than a search accompanied by a suspect. The court has been presented with no reason that the officers would grant such a request unless a suspect had given them reason to feel kindly towards him. In this case, this generosity was likely inspired by Defendant's willingness to cooperate, especially when a search warrant would have been simple enough to procure. In contrast, the court finds not credible Defendant's testimony that he bargained for his attendance at the search in exchange for his consent.

Moreover, the consent form signed by Defendant states that his consent was given "voluntarily and without threats and/or promise to me." (Gov't Ex. 2.) While the standard language on the consent form is not self-determinative, it weighs against Defendant's version of the facts. Further, Defendant's credibility was impugned because he testified that he did not cooperate with the officers, then admitted that he did provide them with information about drug and gun transactions with other individuals under investigation. He has lied to law enforcement officers in the past, when it has served his purposes.

Upon examining the evidence as a whole, the court concludes that after having been *Mirandized* and questioned, Defendant determined that cooperation with investigating agents would be more helpful to his legal situation than not. He cooperated by providing information about his associates and by allowing the police to search is residence and vehicles, providing them additional information along the way as he remembered it. There was also credible evidence that, since he has been incarcerated, he has contacted investigators seeking to cooperate further. Accordingly, Defendant's version of the facts is deemed not credible. He voluntarily and freely consented to the search of his home.

**IV.**      **Conclusion**

Because the government has sustained its burden of showing, by a preponderance of the evidence, that the traffic stop was lawful and Defendant's consent to search was given freely and voluntarily, Defendant's motion to suppress evidence found pursuant thereto will be denied.

                                                                s/Sylvia H. Rambo
                                                                SYLVIA H. RAMBO
                                                                United States District Judge

Dated:  January 31, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**     :     No. 1:07-CR-0192-01
                               :
**v.**     :     **JUDGE SYLVIA H. RAMBO**
                               :
**MALVERSE GILES**     :

### O R D E R

For the reasons stated in the accompanying memorandum of law, Defendant's motion to suppress evidence (Doc. 91) is **DENIED**.

                                                    s/Sylvia H. Rambo
                                                    SYLVIA H. RAMBO
                                                    United States District Judge

Dated: January 31, 2008.